# CLAIRE ANN SERABIAN *v.* RICHARD K. ALPERN

[No. 94, September Term, 1978.]

*Decided April 2, 1979.*

*Carole C. Perez* for appellant.

*Anthony J. D. Schmidt* for appellee.

MURPHY, C. J., delivered the opinion of the Court.

By order dated May 18, 1978, the District Court of Maryland, Sixth District (Montgomery County), sitting as a Juvenile Court, directed that Claire Serabian pay $2,500 as counsel fees to Richard Alpern in connection with his legal representation of Mrs. Serabian's minor daughter (the juvenile). Mrs. Serabian appealed claiming that the court had no authority "to assess a parent for the services of an attorney who has represented a juvenile at the request of the court." We granted certiorari prior to decision by the Court of Special Appeals.

The juvenile was the subject of four juvenile petitions filed in the District Court in Montgomery County — Docket Numbers 343-76, 1543-76, 44-77, and 1033-77. None of the juvenile petitions are included in the record. Alpern's petition for counsel fees represented that he rendered services on the juvenile's behalf in connection with each of these cases.

The record discloses that in the case docketed as No. 1543-76 the juvenile was charged with trespassing by a delinquency petition. On October 8, 1976, a detention hearing was held before Judge L. Leonard Ruben at which Mrs. Serabian was present. The court ordered that the juvenile be temporarily detained at the Waxter Children's Center. The "court record" sheet included in the record extract indicates that the court directed that the "P.O." be notified "to have someone represent her [the juvenile] at F & J [Full and Just hearing] on trespassing," which was scheduled for November 8, 1976.[1]

---

1. It can be gleaned from the names appearing in the record that the "P.O." referred to by Judge Ruben was a probation officer, and not the Public Defender.

On October 13, a hearing was held before another Juvenile Court judge (Tracey, J.) to determine whether Judge Ruben's placement should be modified. By order dated October 13, Judge Tracey directed that the juvenile be transferred temporarily to a shelter home. The "court record" sheet of the case docketed as No. 1543-76 (the delinquency petition for trespassing) indicates that a copy of the "entire file" was thereafter sent to Attorney Richard Alpern.

The next proceeding disclosed in the record involving the juvenile was held fourteen months later on December 19, 1977, and was referenced under Juvenile Docket No. 1033-77. The court order signed on that date by Judge Tracey indicates that the proceedings were "for the purpose of adjudication" but that there was no need for "any further formal presentation." The petition was, therefore, dismissed "without prejudice." On December 30, 1977, a hearing was held before Judge Tracey on Juvenile Docket Nos. 343-76 and 1543-76 to modify the placement of the juvenile, who was at that time in Springfield State Hospital. As a result, the juvenile was transferred to the Sheppard and Enoch Pratt Hospital. The record does not indicate whether there was an adjudication of the delinquency petition for trespassing, nor does it disclose the nature or disposition of the juvenile petition docketed as No. 343-76.

Alpern's petition for counsel fees was filed with the court on February 14, 1978. He alleged in the petition that he was appointed by Judge Tracey to represent the juvenile on October 8, 1976, and did so in connection with Juvenile Docket Nos. 343-76, 1543-76, 44-77, and 1033-77. The petition set forth eleven dates on which Alpern appeared in court representing the juvenile; included were October 8 and 13, 1976, and December 19, 1977, the latter being the last date that Alpern asserted he provided legal services for the juvenile. In addition to court appearances, the petition alleged that other legal services were provided on the juvenile's behalf. A total of eighty-five hours for all services was claimed. The petition alleged that monies were received from the Social Security Administration for the juvenile's use, support and benefit and, in addition, other monies were received from a "trust

fund" established for the juvenile's support. Alpern sought an order requiring the trustees to pay the counsel fees, together with such other relief as the court deemed just and appropriate.

Answering the petition for attorney's fees, Mrs. Serabian claimed that there was no need for the appointment of counsel; that the social security funds received on behalf of the juvenile were totally committed for her care; and that no separate "trust fund" existed for the juvenile's support.

A hearing was held on Alpern's petition on May 8, 1978, before Judge Tracey. Alpern testified that he had been appointed by Judge Tracey on October 8, 1976, to appear at the detention hearing on the delinquency petition docketed as No. 1543-76. Judge Tracey stated that there was a "note" in the file that as of October 22, 1976 Alpern "agreed to be a Court-appointed attorney [for the juvenile] per Judge Ruben." [2] He said that Alpern's representation "was for the child and not for the family," nor was it for the Department of Juvenile Services or for the court. At the conclusion of the hearing, Judge Tracey found $2,500 to be a fair and reasonable fee for Alpern's legal services in connection with the juvenile's "delinquency and proper care," and ordered Mrs. Serabian to pay it.

On appeal, Mrs. Serabian contends that she was never advised by the court of the necessity or advisability of obtaining counsel. She claims that she was not afforded an opportunity to employ counsel of her own choice, nor was she told that the cost of the court-appointed lawyer's services could or would be assessed against her. She argues that there was no evidence of a conflict of interest between her daughter and herself, no finding by the court of a need for counsel independent of the parent's selection, or any showing of unwillingness on her part to provide counsel to represent the juvenile.

Alpern contends in his brief — contrary to representations made in his petition for counsel fees and in his testimony at the hearing — that he was appointed by Judge Ruben on

2. The record before us contains no such notation.

October 22, 1976, and first appeared on behalf of the juvenile at the delinquency hearing on November 8. He contends that his court appointment as the juvenile's counsel was proper under *In re Gault,* 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967). He suggests that there was a conflict of interest between Mrs. Serabian and the juvenile, which mandated the court's appointment of independent counsel for the juvenile. He maintains that because Mrs. Serabian had a common law duty to provide the juvenile with necessaries, her refusal to do so permitted the court to appoint counsel, and because the parent, without objection, allowed the juvenile to receive his services, a promise to pay therefor was implied.

Alpern also relies on Maryland Code (1974, 1978 Cum. Supp.), § 3-834 of the Courts and Judicial Proceedings Article as authority for his appointment, and for the court's order directing that Mrs. Serabian pay the fee. Section 3-834 provides:

> "(a) In addition to any requirements relating to the appointment of counsel for children, at any time during the pendency of any action where it appears to the court that the protection of the rights of a child requires independent representation, the court may, upon its own motion, or the motion of any party to the action, appoint an attorney to represent the interest of the child in that particular action. Such actions include but are not limited to those involving a child in need of assistance, child in need of supervision, delinquent child, or mentally handicapped child.
>
> "(b) The compensation for the services of the attorney may be assessed against any party or parties to the action." [3]

Section 3-834 was enacted by ch. 935 of the Acts of 1977 and became effective on July 1, 1977. It was not, therefore, in existence at the time that Alpern initially undertook to represent the juvenile. Nor was there any other statute or

---

[3]. A "party," as that term is defined in § 3-801 (q), specifically includes the child's parent.

Maryland rule in existence at that time expressly authorizing the Juvenile Court to assess counsel fees of court-appointed counsel against a parent.

Maryland Rule 906, as it existed on October 8, 1976, when the juvenile was first brought before Judge Ruben, provided that a juvenile was entitled to be represented in juvenile proceedings "by counsel retained by him, his parents, guardian or custodian, or appointed pursuant to the provisions of subsection b. 2. of this Rule." Subsection b 2 provided then, as it does now, that "an indigent party, or an indigent child whose parents are either indigent or unwilling to employ counsel, shall be entitled to be represented by the Office of the Public Defender at any stage in a[n] ... adjudicatory or disposition hearing, or hearing under Rule 916 (Modification or Vacation of Order)." Maryland Rule 906 was amended effective January 1, 1978, by adding thereto new subsection b 3 to conform with § 3-834; as amended, the rule expressly provided that the Juvenile Court could appoint an attorney to represent a child and that "[c]ompensation for the services of the attorney may be assessed against any party."

While the statutory power of the Juvenile Court to appoint counsel to represent juveniles is manifest, the court's authority to order a parent to pay counsel fees of a court-appointed attorney was not so clear, at least until the enactment of § 3-834 and the promulgation of Maryland Rule 906 b 3. It is true, of course, that in May of 1978, when the court signed an order requiring the parent to pay Alpern's fee, the statute and rule were in effect. In the view we take of the case, however, we need not decide whether the statute and the rule should be afforded retroactive application to cover services rendered by attorneys appointed by the court prior to the effective date of the legislative enactments.

The record discloses that Mrs. Serabian is a widowed mother of five children, each of whom receives $120 monthly from the Social Security Administration. Mrs. Serabian's 1977 income as a school teacher was $16,000. The record indicates that she is heavily in debt for medical and other care provided to the juvenile. No inquiry appears to have been made by the

court concerning Mrs. Serabian's eligibility to avail herself of the services of the Public Defender under Maryland Rule 906. Nor does the record indicate that any inquiry was made as to Mrs. Serabian's willingness and financial ability to engage counsel of her own choice to represent her daughter. There was no evidence of any conflict between the parent and the child or any notice to Mrs. Serabian that if counsel were appointed by the court, she would be expected to pay for his services.

The record shows that Mrs. Serabian was present before the Juvenile Court on both October 8 and 13, 1976, and that no attorney representing her daughter was present on either occasion. The court's conclusion that there was need for counsel is manifested only by Judge Ruben's entry on the court record sheet of October 8, 1976, in Docket No. 1543-76, that the probation officer be notified "to have someone represent" the juvenile at the delinquency hearing scheduled for November 8. There is no indication in the record that Mrs. Serabian was notified of Judge Ruben's action, nor of the later notation, recorded on the court record sheet of October 13, that the "entire file" had been forwarded to Alpern. There was no written order appointing Alpern as counsel and nothing in the record indicates that Mrs. Serabian was formally notified that the court had appointed Alpern, as the juvenile's counsel, and that she would be expected to pay his fees. While Mrs. Serabian undoubtedly understood at the delinquency hearing held on November 8 that Alpern was representing her daughter, absent notice to her that she could be liable for his fee, she may have looked upon Alpern as an unpaid volunteer, as a representative of the Public Defender's Office, or as a lawyer supplied by another public agency.

Alpern testified at the hearing that his appointment was in connection with the case docketed as No. 1543-76 (trespassing petition). While it is apparent that he rendered extensive legal services on the juvenile's behalf well beyond those required in connection with the trespassing petition, we do not think that the court's order requiring the parent to pay the $2,500 fee was authorized under the facts of this case.

It has been held that legal services provided to a minor may,

in some circumstances, be deemed "necessaries" for which a parent may be required to pay, *e.g.,* where they are reasonable and necessary for the protection or enforcement of the property rights of the minor or for his personal protection, liberty or relief. *See Price v. Perkins,* 242 Md. 501, 219 A. 2d 557 (1966); *Price v. Price,* 232 Md. 379, 194 A. 2d 99 (1963); *Carter v. Carter,* 156 Md. 500, 144 A. 490 (1929). Recovery against the parent for legal services so rendered must ordinarily be sought, as these cases point out, in an action at law. Whether such an action would lie against Mrs. Serabian for Alpern's legal services in a law action is a question not before us, but manifestly is one that would depend upon the facts and circumstances of the case.

*Judgment reversed, with costs.*